MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

KYLE F. WALDINGER (ILBN 6238304)
HALLIE MITCHELL HOFFMAN (CABN 210020)
Assistant United States Attorneys

   450 Golden Gate Avenue, 11th Floor
   San Francisco, California 94102
   Telephone: (415) 436-7200
   Facsimile: (415) 436-7234
   E-mail:   kyle.waldinger@usdoj.gov
              hallie.hoffman@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Criminal No. CR 12-217 WHA |
|    Plaintiff, ) | **UNITED STATES' SENTENCING MEMORANDUM** |
|    v. ) | Date: May 1, 2013<br>Time: 10:00 a.m.<br>Judge: Hon. William Alsup |
| ROY LIN and JOHN LIN, ) | |
|    Defendants. ) | |

U.S. Sentencing Memo
CR 12-217 WHA

## I. Introduction

On March 27, 2011, the defendants were indicted with one count of Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C § 1349, six counts of Mail Fraud, in violation of 18 U.S.C § 1341, and three counts of Money Laundering, in violation of 18 U.S.C § 1957. On December 11, 2011, the defendants pled guilty before Your Honor. ROY LIN pled guilty to one count of mail fraud and one count of money laundering; JOHN LIN pled guilty to one count of mail fraud. In its probation sentencing report for ROY LIN ("RL PSR"), the Probation Department ("Probation") calculates the defendant's total offense level to be 29, with a corresponding prison sentence range of 87 – 108 months. RL PSR ¶ 84. In its probation sentencing report for JOHN LIN ("JL PSR"), Probation calculates the defendant's total offense level to be 28, with a corresponding prison sentence range of 78 – 97 months. JL PSR ¶ 82. Probation then recommends a sentence of 24 months for both defendants. JL & RL PSRs, Sentencing Recommendation. The United States agrees with Probation's guideline calculations for both defendants but disagrees with the sentencing recommendation. For the reasons set forth herein, the United States respectfully requests that the Court impose a sentence of 41 months in prison followed by three years on supervised release with the conditions set forth in the PSR for ROY LIN and 37 months in prison followed by three years on supervised release with the conditions set forth in the PSR for JOHN LIN.

## II. Summary of Pertinent Evidence

Neither defendant objects to the offense conduct as set forth by Probation. ROY LIN, the CEO, and his brother JOHN LIN, ran INC21.com Corporation (INC21), a business that purportedly provided internet-based services. INC21 was a California corporation located in San Francisco that had numerous affiliated or subsidiary companies including GlobalYP, Netopus, Jumpage Solutions and GoFaxer (collectively INC21 companies). These INC21 companies were also based in San Francisco at the same location as INC21 and were also run by the LINS. Corporate filings for the INC21 companies with the State of California, and all filed updates, indicated that either ROY LIN, JOHN LIN, or some combination of the two, were officers or directors in each of the companies (see Exhibit 1).

INC21 charged services provided to its customers through Local Exchange Carrier (LEC) billing. LECs are local telephone providers (like Verizon or AT&T). LEC billing was a method for billing internet and other electronic based services by placing charges for the service on the customer's telephone bill. Thus, instead of the consumer paying for the service directly to an INC21 company, a charge for the service appeared on the customer's telephone bill, and the customer paid for the service as part of the payment of his or her telephone bill. The INC21 companies seeking approval from a LEC to place charges on the telephone bill did not deal directly with the LEC, but rather had to go through billing aggregators. The billing aggregators contracted directly both with the LECs and with the INC21 companies.

The billing aggregators and the LECs decided whether or not to approve a service provider (*i.e.*, INC21 Companies) for LEC billing based on information provided by the service provider on various application forms. The information related to whether or not the service provider, or any of its affiliates or officers and directors, had ever received any prior cramming complaints, sanctions by states attorney generals or other governmental agency, or terminations by other LECS for cramming complaints or other fraudulent billing practices. A LEC does not want to subject its customers to a service provider that will "cram" charges on the customer's telephone bill. "Cramming" is the practice of placing unauthorized, misleading, or deceptive charges on a consumer's telephone bill. Because the LECs and billing aggregators heavily relied on the truthfulness of this information provided by service providers to decide whether or not to allow that service provider to bill for its services on a customer's telephone bill, most forms required that the service provider attest that the information that they were providing on the form was accurate.

The INC21 companies had numerous prior cramming complaints, sanctions by states attorney generals or other governmental agencies, or terminations by other LECS for cramming complaints or other fraudulent billing practices (see Indictment at p.2 to 4). In order to continue to access to LEC billing and be able to bill customers on their telephone bills, the LINs made material misrepresentations and material omissions on the forms.

The first area of misrepresentations involved information that the LINS provided about the company's profile, specifically who were the principals/officers/directors, what companies were affiliated, and what were their addresses. Knowing the identity of the principals was important to the LECs/billing aggregators so they could check whether that individual was linked to another service provider that had complaints against it. The LEC ran background checks on the listed principals or kept informal lists of problematic individuals. During the scheme to defraud, ROY and JOHN LIN utilized many different names of principals to prevent the billing aggregators and LECs from connecting the INC21 companies and discovering that the same principals who had prior complaints of cramming against them were the principals of the company applying to LEC bill. Also, during the fraud scheme, the LINS would utilize their parents' home address and their home addresses to mask the company's true identity as connected to INC21 being based at the same address as INC21 and other INC21companies.

The second main area of misrepresentations involved information that the LINS provided, and failed to provide, about the history of any LEC billing related actions taken against entities associated with the LINS. Having this information was very important to the LECs' and billing aggregators' decision of whether or not to allow a service provider access to LEC Bill.

The LINS hid regulatory actions taken against the applicant INC21 companies, their affiliates, and their director/principals related to LEC billing. The numerous regulatory actions taken against INC21companies are set forth in the indictment. In addition, the LINS hid prior sanctions and terminations by LECs due to cramming complaints.

Due to the fraud scheme, the INC21 companies were granted access to LEC billing. Customers were billed for the services provided by the INC21 companies, between $14.99 and $29.99 per month (depending on the service). The IRS special agent on this case determined based on bank records, that from the indicted scheme of fraudulently gaining access to LEC bill, through the two billing aggregators alleged in the indictment, the LINS obtained over $5,000,000 from consumers (see Exhibit 2).

The LINS transferred the proceeds from the fraud scheme from a bank account at Bank of America into another Bank of America account under their control. ROY and JOHN LIN

both controlled and held signatory authority over the INC21 main bank account which initially held all the revenues fraudulently earned from the other INC21 companies. Later, the LINS opened separate bank accounts for Jumpage Solutions (ROY and JOHN LIN both have control and signatory authority), GoFaxer (ROY LIN and Sheng Lin have signatory authority), and MetroYP (JOHN LIN has signature authority). Netopus and GlobalYP were always kept as part of INC21.com's main bank account.

## II.     Guidelines Calculation

### A.     ROY LIN

In his plea agreement, defendant ROY LIN admits that "through this fraudulent LEC billing, INC21 companies collected revenues of more than $2,500,000 but not more than $7,000,000 from thousands of consumers."  ROY LIN Plea Agreement, p.4.  Based on a loss amount of more than $2,500,000 but not more than $7,000,000, and the number of victims in excess of 250, ROY LIN's guideline calculations are as follows:

|  | U.S.S.G. Section | Level/Points |
|---|---|---|
| Wire Fraud Base Offense level | 2B1.1 | 7 |
| Wire Fraud Specific Offense Characteristic | 2B1.1(b)(1)(J) (loss amount > $2.5M) | 18 |
|  | 2B1.1(b)(2)(C) (> 250 victims) | + 6 |
| Wire Fraud Total Offense Level |  | 31 |
| Money Laundering Base Offense Level | 2S1.1(a)(1) | 31 |
| Money Laundering Specific Offense Characteristics | 2S1.1(b)(2)(A) (18 U.S.C. § 1957) | +1 |
| Money Laundering Total Offense Level |  | 32 |

| Grouping of Counts | 3D1.2(c) (Grouping) | 32 |
|---|---|---|
| Acceptance of Responsibility | 3E1.1(a) & (b) | -3 |
| | | 29 |
| Criminal History Category | | I |
| **RANGE** | | **87-108** |

ROY LIN agrees with this guideline calculation and has no unresolved objections with Probation's pre-sentence report.

**B.     JOHN LIN**

JOHN LIN, however, did not agree to a guidelines calculation in his plea agreement. In response to Probation's pre-sentence report, he objects to loss calculation, the number of victims, and not receiving a minor role reduction.

The government and Probation agree that the applicable guideline computation is the following:

| | **U.S.S.G. Section** | **Level/Points** |
|---|---|---|
| Base Offense level | 2B1.1 | 7 |
| Specific Offense Characteristics | 2B1.1(b)(1)(J) (loss amount > $2.5M) | +18 |
| | 2B1.1(b)(2)(C) (> 250 victims) | +6 |
| Total Offense Level | | 31 |
| Acceptance of Responsibility | 3E1.1(a) & (b) | -3 |
| | | 28 |
| Criminal History Category | | I |
| **RANGE** | | **78-97** |

   **i.     Loss Calculation (Objection No. 2)**

The defense argues that the loss amount should be limited to "the count of conviction *and agreed to* in the plea agreement." (JL PSR, Objection No.2, emphasis added)

First, there was no agreed to loss amount in the plea agreement. In fact, the plea agreement explicitly states otherwise, "[t]he parties agree that the loss associated with the count of conviction is less than $10,000. However, the government reserves the right to argue for a higher Guideline range and other appropriate Guideline-related adjustments based on relevant conduct alleged in the dismissed counts of the Indictment." JOHN LIN Plea Agreement at 5.

Second, the notion that loss should only be based on the count of conviction and not relevant conduct taken by co-conspirators flies in the face of well established law and the guidelines themselves. See United States v. Lorenzo, 995 F.2d 1448, 1460 (9th Cir. 1993) (a defendant is held responsible for the "reasonably foreseeable conduct of his co-conspirators in furtherance of the execution of their jointly undertaken criminal activity"); U.S.S.G. §1B1.3(a)(1)(B). United States Sentencing Guideline §1B1.3(a)(1)(B) states that relevant conduct should be included in determining the guideline range and includes:

> [I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.

In the present case, a conspiracy was actually charged. The evidence shows that ROY LIN and JOHN LIN were part of the charged conspiracy from its inception. Both ROY LIN and JOHN LIN were listed as officers or directors on the INC21 Secretary of State filings. JOHN LIN is also listed as an officer of the following affiliated INC21 companies: GoFaxer, NetOpus, and Jumpage Solutions. The evidence shows that both ROY LIN and JOHN LIN received millions upon millions of dollars from this fraudulent scheme into an account that they controlled. The evidence shows that of this illicit money that came into INC21's account, millions was then sent on to JOHN LIN personally (see Exhibit 3). The government is at a loss to understand how JOHN LIN is somehow suddenly exempt from the charged conspiracy when he admitted in the factual basis of his plea that "[d]uring the period April 2007 through June 2009, I ran INC21.com Corporation (INC21) and its affiliates GlobalYP, JumPage Solutions, and GoFaxer." JOHN LIN Plea Agreement at 2.

To then determine the loss amount, the government must prove the applicable loss amount by a preponderance of evidence. United States v. Riley, 335 F.3d 919, 929 (9th Cir.

2003). In the present case, the government undertook the gains method because "there was a loss but it could not be reasonably determined." U.S.S.G. §2B1.1, application commentary note 3(B). The government was careful to separate loss caused by the charged criminal scheme of fraudulently gaining access to LEC billing versus the loss created by INC21 companies that was the subject of the related civil forfeiture and FTC suit. In order to separate out the criminally charged conduct from the broader loss amount that all customers lost due to INC21 companies, the government isolated the money gained through the charged fraudulent billing scheme. This could be accomplished by reviewing the billing aggregators' (ILD and Payment One) records and examining how much money they passed along to the defendants after the defendants fraudulently gained access to LEC bill. The resulting amount was $5,323,538.27. See loss spreadsheets attached as Exhibit 2; see also United States v. Melvin, 91 F.3d 1218, 1227 (where the district court estimated loss amount based on the amounts deposited in bank accounts for each scheme, was a valid way of determining loss amount). Moreover, JOHN LIN's co-conspirator admitted that this loss amount was the result of ROY LIN's and JOHN LIN's fraudulent scheme of LEC billing. ROY LIN stated under oath that "I admit that, through this fraudulent LEC billing, INC21 companies collected revenues of more than $2,500,000 but not more than $7,000,000 from thousands of consumers." ROY LIN Plea Agreement at 4. The Court is entitled to look at evidence of loss regarding a co-conspirator when determining the loss attributable to the defendant. See Lorenzo, 995 F.2d at 1460.

        **ii.**    **Number of Victims** (Objection No. 3)

The defense argues that the government did not prove that the victims suffered an actual loss as the government has failed to show that the victims were not provided with the INC 21 companies' services. This is an absurd argument. Essentially it amounts to that if a person takes money from you, without your authorization, you are not a victim so long as they provide you with something for that money that they have taken. Whether or not the victims were actually provided with the INC21 companies' services is of no consequence. What matters is that due to the defendant's fraud, the defendant's had the access and ability to bill the customers for services

through the customer's telephone bill whether or not the customer elected to be provided with the service.

In <u>United States v. Hunter</u>, 618 F.3d 1062 (9th Cir. 2010), the defendant committed mail fraud by mailing false documents to employers for the purpose of gaining employment as a nurse. After conviction, the defendant argued that if she was made to pay restitution to her employers for the amount of her salary, the employers would receive a windfall. She argued that the employers sustained no actual loss because she actually performed the work of a nurse for which she was paid. The court found that she only obtained the employment position because of the false documents, and the employers would have never paid for her services as an unlicensed nurse. <u>Id</u>. at 1064. In the present case, it is a parallel situation. The customers paying for services provided by INC21 companies were fraudulently led to believe that the INC21 company had the credentials to bill on their telephone bill. It is actually worse since the victims did not authorize the charges in the first place. Whether or not the INC21 companies' customer actually received the service is no consequence. If the INC21 companies had not fraudulently gained access to LEC bill though misrepresentations, the customer would never have purchased their services.

Similarly, in <u>United States v. Kaminiski</u>, 501 F.3d 655 (6th Cir. 2007), a defendant was ordered to pay restitution for actual loss to victims who had purchased drugs believing the drugs were FDA approved. The defendant argued that there was no actual loss because there was no evidence that the drugs were ineffective or otherwise detrimental. The Sixth Circuit disagreed and held that the economic harm to the customers was that they "d[id] not get what they paid for."

In the present case, by the defendants' fraudulent scheme to gain access to LEC bill, the victims were forced to pay for services on their phone bill that they should never have been exposed to in the first place. Whether or not they took advantage of those services provided, as the victim customer taking the non-FDA approved drug or the employer gaining the work performance of an alleged nurse, is inconsequential. The government need not prove that the victims did not use the INC21 companies' service to show an actual loss; the government must

show that the victims suffered an actual loss from the defendant's fraudulent scheme. Actual loss is defined in the guidelines as, "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, Commentary Application Note 3(A)(i). Subjecting the victims to charges on their telephone bills that they didn't solicit, and from unauthorized service providers, creates a reasonably foreseeable pecuniary harm to the victims.

In forming the list of victims in this case, the case agent complied information that he had received from the Better Business Bureau, States Attorney General Offices, the Federal Trade Commission, the California Public Utilities Commission, and other agencies concerning victims who had been billed by an INC21 company for unauthorized charges on their telephone bills. The case agent also learned of individuals who had complained to the billing aggregators or LECs for unauthorized charges on their phone bill by INC21 companies. Finally, the case agent cold called randomly selected individuals who had been charged on their phone bill by INC21 companies to inquire whether or not the charges had been authorized. The agent then compiled a list of victims who he was aware that had fraudulently been charged on their phone bills by INC21 companies without their authorization. This list was provided as a victim list and contains over seven hundred individuals. This list, however, is not exhaustive. The agent did not have the time to call every single person who had be billed by INC21 companies on their telephone bill. There are likely many more victims.

The defense suggests that perhaps a mass marketing of victims, under U.S.S.G. §2B1.1(b)(2)(A)(ii) is the more appropriate enhancement. The government agrees that the enhancement for the commission of the fraud scheme through mass marketing would apply. However, U.S.S.G. § 2B1.1(2) clearly states "Apply the Greatest." Even if this fraud scheme was committed through mass-marketing, that is only a sentencing enhancement of two levels. Since this fraud scheme involved more than 250 victims, the enhancement should be six levels. Since six levels is greater than two levels, six levels should be applied.

### iii. Minor Role (Objection No. 1)

The defense objects that JOHN LIN did not receive a downward adjustment for minor role. The mitigating role reduction is for a minor participant. U.S.S.G. §3B1.2(b). In that

guideline section, application commentary note 3(A), a minor participant is defined as "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant."

The government has already set forth above how (1) JOHN LIN was listed as an officer or director of many of the INC21 companies, (2) JOHN LIN had control of the bank account into which all the fraudulent money was sent, and (3) JOHN LIN was transferred millions of dollars from the illicit money in the INC21 account into his personal account. Given JOHN LIN's involvement in the entire scheme, his access to and control over all the money obtained from the scheme, and his gain of millions of the ill-gotten gains directly into his personal bank account defies any mitigating role reduction. He is at least an average participant in the fraud scheme.

### III.     Sentencing Recommendation

As stated above, the government and Probation agree to the applicable guideline range calculation. For ROY LIN that is 87-108 and for JOHN LIN that is 78-97. The government has considered all the mitigating factors that Probation discussed: ROY LIN's health, that both defendants are likely to face deportation after sentencing, that the defendants were already made to pay substantial civil forfeitures for fraudulent billing customers from the INC21 companies, that both defendants have never been convicted of any prior offense, and the defendants' troubled childhood.

However, the government has also considered further sentencing factors under 18 U.S.C. § 3553(a). First, under 18 U.S.C. § 3553(a)(2)(B), the court must consider the need for the sentence "to afford adequate deterrence to criminal conduct." The LINs scheme of fraudulently gaining access to LEC billing caused hundreds of victims to lose millions of dollars. Since today, most all of our information is stored electronically, there are ample opportunities for fraudsters to take advantage of people not reviewing their bills closely and unwittingly paying for charges that they did not knowingly incur. The small check on this is that phone companies (or other billing companies) can regulate who has access to charge their customers. There needs to be a consequence for lying to the companies in order to fraudulently gain access to, and

U.S. Sentencing Memo
CR 12-217 WHA                    11

charge, their customers. Without a consequence, there is nothing to deter others from doing similar criminal activity.

Second, the Court must consider the need for the sentence "to reflect the seriousness of the offense" and "to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). As stated numerous times already, the defendants' fraud caused hundreds of people to, in the aggregate, lose millions of dollars. A significant time of incarceration is needed to reflect the seriousness of that and to provide just punishment for the offense.

The government has carefully weighed the sentencing factors discussed by probation and the defendants with the aforementioned sentencing factors of needing a sentence that affords adequate deterrence and a sentence that reflects the seriousness of the crime and provides just punishment. After careful analysis, the government believes that a sentence of incarceration for ROY LIN of 41 months (where his guidelines are 87-108) and a sentence of incarceration for JOHN LIN of 37 months (where his guideline range is 78-97) is appropriate.

## IV.   Conclusion

For the reasons set forth herein, this Court should impose a sentence of 41 months in prison followed by three years on supervised release with the conditions set forth in the PSR for ROY LIN and 37 months in prison followed by three years on supervised release with the conditions set forth in the PSR for JOHN LIN.

DATED: April 24, 2012                    Respectfully submitted,

                                         MELINDA HAAG
                                         United States Attorney


                                         _____/s/_____
                                         KYLE F. WALDINGER
                                         HALLIE MITCHELL HOFFMAN
                                         Assistant United States Attorney