STEVEN G. KALAR
Federal Public Defender
ELIZABETH FALK
Assistant Federal Public Defender
19th Floor Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700

Counsel for Defendant JOHN LIN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-12-217 WHA |
| | ) | |
| Plaintiff, | ) | **DEFENDANT JOHN LIN'S** |
| | ) | **SENTENCING MEMORANDUM** |
| v. | ) | |
| | ) | **OBJECTIONS TO THE PRESENTENCE** |
| | ) | **REPORT** |
| JOHN LIN, | ) | |
| | ) | Court: Hon. William H. Alsup |
| Defendants. | ) | Date:  May 1, 2013 |
| | ) | Time:  11:00 a.m. |
| _____ | ) | |

## INTRODUCTION

Defendant John Lin now appears before the Court for sentencing having been convicted of one count of mail fraud, in violation of 18 U.S.C. § 1341. The Probation Officer assigned to the case has recommended a sentence of 24 months imprisonment - a significant departure from the government's suggested Guideline range reflecting the unusual nature of this case and the many factors at issue under 18 U.S.C. § 3553(a).

Mr. Lin very much appreciates the recommended departure and consideration that the Probation Officer has put into recommending a mitigated sentence in this matter. Such a departure is wholly justified in the instant case due to Mr. Lin's abusive childhood, his largely productive and law abiding life, the fact that full restitution of the alleged Guideline loss amount

1   has been restored to the victims, and his sincere regret and remorse at having committed the

2   instant offense.  In weighing these factors, the Court should strongly consider the dozens of

3   letters written in support of John Lin and presented in the accompanying Declaration in support

4   of sentencing – all of which attest to Mr. Lin's generous and giving nature, dedication to charity

5   work, and strong positive presence in the community.

6          In addition to these factors, however, the Court must also consider the Guideline range

7   and the Presentence Report, both of which contain substantial errors and faulty conclusions

8   about Mr. Lin's role in the offense and his relative level of culpability in both devising and

9   carrying out the charged scheme.  In sum, the heart of the fraudulent conduct charged here -

10  fraudulent access to LEC billing – was conducted by means of a relationship between INC21 and

11  billing aggregators ILD and Payment One that was exclusively built, monitored and maintained

12  by Mr. Lin's brother, Roy Lin.  As the manager of information technology, Mr. John Lin's real

13  role in INC 21 was one of technology, not business management.  In terms of how and who to

14  bill for INC 21 services and the services of affiliated companies, John Lin had little to no contact

15  with Payment One or ILD and simply was not the individual in charge of these management

16  decisions.  At sentencing, it is anticipated that the government will not contest this fact.

17          Accordingly, while Mr. Lin fully accepts responsibility for his conduct in the instant

18  case, and fully admits that he reviewed and signed forms he should not have that contains

19  untruthful information, it is important for the Court to understand that in the grand scheme of

20  wrongdoing here, John Lin is simply less culpable in this case than Roy Lin.  This is because

21  John Lin's overall involvement in the day to day management of the company, the billing

22  process, the relationships with the LECS and the billing aggregators, and the overall scheme –

23  was minimal, and his level of knowledge about what was going on between INC21 and the

24  billing aggragators was extremely small.  He stands before the Court beside his brother with a

25  heavy heart and full acceptance of responsibility because, as Roy's brother, he reaped the

26  benefits of INC21's profits, and now must share in the company's downfall and correlating

1   punishment associated with that downfall.  Regardless of the minimal role he played in both the

2   execution and the carrying out of the scheme to defraud, Mr. Lin fully acknowledges that his role

3   was a federal crime, was immoral, and he is prepared to accept this Court's sentence.

4       After considering these arguments, the requested reductions in the Guideline range, and

5   the factors identified by the Probation Officer under 18 U.S.C. § 3553(a), Mr. Lin requests a

6   sentence of three years of probation.

7                                   **STATEMENT OF FACTS**

8       **Background**

9       John Lin is the baby brother of Roy Lin and a son of two hardworking immigrant parents

10  who taught him the value of hard work, education, innovation, and family life.  As a young boy,

11  Mr. Lin enjoyed a stable childhood in Taichung, Taiwan – attending school while his parents

12  were busy running a family owned lighting and fixture factory in Taiwan. PSR at ¶ 55. In the

13  early 1980s, however, growing political instability in Taiwan led Mr. Lin's parents to make the

14  difficult decision to remove the boys from the country for their own protection.  Mr. Lin's world

15  was subsequently altered forever when he was sent to live with an uncle in Brazil in 1981.  PSR

16  at ¶56; Falk Dec. I, Exhibit A, letter from Sheng Jui Lin, father of John Lin.  It is hard to imagine

17  the fear that ten year old John Lin must have felt at being sent across the world to live in a

18  foreign country with relatives he did not know – and equally impossible to measure the impact of

19  the life he discovered there.  Unbeknownst to Mr. Lin's parents, the uncle had called for Roy and

20  John Lin because he both needed free labor at his restaurant and was determined to "toughen up"

21  nephew he perceived as "two soft."  As described in the PSR, Mr. Lin suffered greatly as a result

22  of his uncle's mistreatment, at the exact age when a young boy needs positive adult

23  reinforcement, rather than abuse:

24  \\

25  \\

26  \\

1
2
3

> During weekdays, his When he was unsatisfied with the their work, the uncle would beat the defendant with broomsticks, slap his across the face with his hands, and use profanities in a demeaning fashion. There were other times when the defendant was punished by holding a case of empty glass soda bottles above his head while maintaining a squatting position for two to three hours.

4   PSR at ¶ 57. For over two years, Mr. Lin endured this lifestyle, unable to inform his

5   parents about the mistreatment because all of his telephone calls were monitored and he feared

6   retribution. *Id*. The abuse only ended when Mr. Lin's parents finally visited Brazil in 1983 and

7   saw first-hand the lifestyle their children had been living.

8   This visit resulted in Mr. Lin's parents' decision to send both boys to the United States to

9   live with different relatives. While this environment was hardly nurturing, it allowed Mr. Lin the

10  opportunity to seek and obtain a quality education in the United States. Problems soon erupted

11  in his living situation, however, as the U.S. relatives began demanding more and more money

12  from Mr. Lin's parents to take care of the boys. To escape the stress and tension, Mr. Lin

13  followed his brother Roy out of his relatives' house at age 14, and went to live alone with his 16

14  year old brother, relying on his parent's support and his sense of self-reliance to raise himself.

15  Mr. Lin's unusual adolescence contained thus contained none of the positive support,

16  guidance and nurturing of an ordinary childhood. He instead learned from a young age to be

17  completely self-reliant and independent – to do what you need to do to get by and survive.

18  Paradoxically, Mr. Lin has a strong dedication to friends and family that is not ordinarily seen in

19  an individual who has raised themselves from such a young age. When Mr. Lin's mother was

20  diagnosed with cancer in 2006, for example, Mr. Lin was the family member who coordinated

21  his mother's treatment and took care of her 24/7 until her death, as attested to by friends and

22  family:

23
24
25

● "It was such a pity that in February 2006 his mother was diagnosed with advanced uterine malignant melanoma, which was resulted from her many years of hard work. John stopped going to work and instead took care of her, making sure she took her medicine and take her to doctor's appointments." (Falk Dec. I, Exhibit A, Letter of Sheng Jui Lin, father of John Lin)

26  \\

- "During the time spent with Mr. Lin's family, we noticed John was quietly taking care of all the details for Mrs. Lin, whether it was with the doctors regarding treatment prognosis or with funeral staff on burial logistics. Not long ago, in June, 2012, Sr. Mr. Lin had a dizzy spell, was unconscious and ended up at the hospital. Once again, we found John at Sr. Lin's side, taking care of him. John, although the younger son, is the primary caregiver to his parents. He was for his mom and now for his dad." (Falk Dec. I, Exhibit A, Letter of friend Jeffrey Sun)

Mr. Lin also enjoys a strong network of friends in the greater Bay Area who have all attested to the strength of his character and his potential for rehabilitation. Numerous community members describe their shock and surprise at learning that Mr. Lin was convicted of any crime and have expressed sincere belief that the instant offense will be his first and only offense. As described by friend Esther Young, "his good nature is striking in its purity . . . he is a thoughtful, sweet, shy, and personable man. In the years since, if there was anything I needed help doing or just to spent some time with a friend, I knew I could count on John." *Id.,* Exhibit A, Letter of friend Esther Young. Other friends describe him as a person of "honesty, generosity, and goodwill, upstanding with me even for something as little as paying me back for tennis balls. He has always made a point to do the right thing." *Id*., Exhibit A, Letter of Justin Duke.

**Education and Work Background**

It is important to note that Mr. Lin and his brother have always worked, starting at the young ages of 10 and 12. After coming to the United States, Mr. Lin worked as a paper delivery boy and assisted his mother by working at the family donut shop, dry cleaning business, and restaurant. Work has, and always will be, a huge part of Mr. Lin's life.

Mr. Lin's success in the field of designing and implementing information technology and working with computers was motivated internally – he has a genuine interest in the way computers and networks work. After graduating from high school in San Francisco (completed without any parental guidance or support, while barely speaking English as a second language) Mr. Lin transferred to City College to pursue a career in information technology. He ultimately graduated from college – again, with little English speaking ability – in May, 1996 with a

Bachelors of Science degree.  PSR at ¶ 69.  He continued to attend City College to earn

certification in Microsoft Systems engineering.  *Id*. at ¶ 70; *see also* Falk Dec. I, Exhibit C.

These certifications led to Mr. Lin's first full time job at Excite Home Network, where he

supervised the network operations center after being "quickly appointed to a management

position."  PSR at ¶ 76

**Mr. Lin's Involvement in the INC21 Companies**

        In 2002, Mr. Lin went to work for his brother Roy's business, INC 21.  At the time the

company was founded in 1999, John Lin was working at Excite Home Network and had little

interest in working with his brother.  When that company shut down, however, Roy invited Mr.

Lin to join INC 21 in 2002 to see if he could assist the company by managing its information.

technology.

        Mr. Lin was most involved in INC 21 during the years 2002-2005 – when INC 21 had

full staffing for each department, which included customer service, legal, and an IT department.

As the CIO and COO, Mr. Lin was mainly responsible for implementing and managing the

information technology of the company.  *See* Falk Dec. I, Ex. B (Organizational chart of INC

21).  He was not present at the company at all in 2006, as he quit work entirely to take care of his

mother who was suffering from a pernicious form of cancer.  *See* Falk Dec., Exhibit A, Letter

from Sheng Lin (father).  Because Mr. Lin's mother was diagnosed quickly with a terminal

situation and told she only had three months to live, Mr. Lin determined that he was the family

member in the best position to care for her full time to make her final days as comfortable and

loving as possible.  Ultimately, her death in December, 2012 meant that Mr. Lin was completely

divorced from the operations of INC 21 during that time.

        In 2007, 2008 and 2009, Mr. Lin barely worked at INC 21.  At that time, as the PSR

relays, Mr. Lin had a primary job with Outlook United in San Mateo, California earning $47,000

a year.  See PSR at ¶ 75.  Accordingly, during the crux of the time period charged in the

indictment, Mr. Lin was not present as a full time worker at INC 21 and was not intimately

involved in the company's internal dealings - including any relationship with the billing aggregators that are the subject of the instant indictment.

**Community Service**

Mr. Lin's dedication to his community and community service work is evident in the many letters of support submitted on his behalf. *See* Falk Dec. I, Exhibit A, Letters of Don Diltz, President of the Rotary Club of San Francisco and Jim Allen, Past President (attesting that Mr. Lin has participated in numerous community service projects through the Rotary Club such as meal delivery for the chronically ill, gift delivery for underprivileged youth during the holidays, grant writing for the Edgewood Learning Facility, an organization that assists in the education of foster youth, green energy development and other projects, stating that Mr. Lin "shares his talents generously" and "puts his heart into his work") In addition to these projects, other Rotary Club members attest as follows:

- "I have observed John as being a gentle and kind man with a big heart to serve the community. He has shared with us his knowledge and expertise in solar energy, and is passionate in advocating the use of solar energy to reduce fossil-fuel consumption." (Falk Dec. I, Exhibit A, Letter of Ken Lai, Rotary Club member);

- "John is an enterprising young man and he has contributed much as a member of our club." (Falk Dec. I, Exhibit A, Letter of Bruce Lyons, Rotary Club member)

- "Mr. Lin has been very positive and he is very generous and has worked very hard to give back to the community by volunteering for activities such as Toys for Tots, Thanksgiving Turkey Drive, calling on local merchants to solicit membership, etc. He is always friendly and would go out of is way for fellow Rotarians and people in need." ((Falk Dec. I, Exhibit A, Letter of Robert Jocson, Rotary Club member)

- "I found John to be straight-forward, a man of his word and always volunteering for what Rotary's projects needed. John was never one to shirk responsibility. . . in Rotary we could always count on John Lin." ((Falk Dec. I, Exhibit A, Letter of Tatiana Kostanian, former Rotary Club member, attesting to the longstanding participation of John Lin in the Rotary Club preceding the indictment in the instant case)

- "After relocating to Mexico John continued to provide his generous assistance and support to the community through phone services, financial assistance in renewing the Internet domains of LinuxCabal, help when needed in shipping things to us in Mexico, and many other such examples of his generosity and helpful and freely given support." (Falk Dec. I, Exhibit A, Letter of Richard Couture, founder of LinixCabal, a non-profit organization dedicated to bringing

information technology to the underprivileged communities of Mexico.)

## OBJECTIONS TO THE GUIDELINE RANGE

The Probation Officer has calculated Mr. Lin's Guideline range as 78-97 months.  This range is incorrect for a number of reasons.  First, the upward adjustment for more than 250 victims is incorrect.  *See* PSR at ¶, 28, 40.  Second, Mr. Lin should receive an adjustment for playing a minor role in the offense.  *See* PSR at ¶ 30, 31, 42.  Finally, the PSR incorrectly holds Mr. Lin accountable for the full amount of the loss amount stipulated to by Roy Lin of $5,323,538.27.  This is incorrect.  *See* PSR at ¶ 39.  Each objection is discussed below, in turn.

**I.      Victim Adjustment Should Either be +0 or +2, Not +6**

The PSR contains an adjustment of +6 for number of victims under U.S.S.G. § 2B1.1(b)(2)(C).  **Yet these victims are nowhere identified in the PSR** and at no point has the government shown the Court who these victims are, or what their losses are.  **The government bears the burden** of proving that victim related enhancements apply to Mr. Lin - but has utterly failed to do so here.  A conclusory statement that "based on the complexity involved in making that determination, only an estimate of up to 1,000 victims was deduced" does not pass muster and does not meet the government's burden.  *See* PSR at ¶ 28.  Quite simply, this number appears to have been selected out of thin air, and is not supported by any documentation or information regarding actual losses suffered by any actual victims.  Accordingly, Mr. Lin must object to the imposition of this enhancement based on an amorphous, conclusory statement by an unknown agent.

According to the Guidelines, a "victim" is "any person who (A) sustained any part of the **actual loss** determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense.  Clearly, subsection (B) is not applicable here.  With respect to subsection (A), there has been absolutely no showing made by the Government in this case that ties any particular individual to any actual loss.  Neither the government's case, nor the guilty plea of Mr. Lin, establishes that any end consumer somehow suffered as a result of the

misrepresentations contained within the forms described in Counts 2-7 of the indictment. .
Victim enhancements must be tied to **actual pecuniary loss**. *See United States v. Pham,* 545
F.3d 712, 722 (9th Cir. 2008); *United States v. Miller*, 588 F.3d 560 (8th Cir. 2009). All told,
neither the government's factual presentation nor the facts stated in the PSR meet the
government's burden in this regard.[12]

## II.        Mr. Lin Should Receive a Minor Role Adjustment

The PSR states that "it is the government's belief that Roy and John Lin share equal
responsibility in the instant offense." *See* PSR at ¶ 31. Had this case gone to trial, it would have
been readily apparent to the jury that this contention is belied by the actual evidence in the case.
First, John Lin's role in the INC 21 companies was far more removed than that of Roy Lin – he
was not intimately involved in the day to day business at the company during the time period

---

[1] In the alternative, it is perhaps appropriate to reduce the adjustment for number of victims should be reduced from 6 to 2 to account for the fact that if there are, in fact, any victims in the instant case, they were adduced and procured through mass marketing activities. *See* U.S.S.G. § 2B1.1(b)(2)(A)(ii)(mass-marketing an alternative to victim enhancement and defined as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (I) purchase goods and services.") Although a dearth of caselaw exists about this alternative enhancement, it appears to be appropriate to employ this enhancement when a mass-marketing campaign to sell services exists within the context of a fraud, which is precisely what the government has alleged in this case. *See* PSR at ¶ 28 ("According to one of the case agents, due to the falsified information provided by Roy Lin and John Lin, anyone who was billed during the period of the scheme could be considered a victim."

[2] The government's sentencing memorandum dismisses this alternate enhancement by arguing that U.S.S.G. § 2B1.1(b)(2) states to "apply the greatest" enhancement. But this is an absurd argument - a mass marketing scheme is, by design, always going to have more than 250 victims. This is implicit in the designation "mass." The government's interpretation of the mass marketing enhancement cannot be correct, because if it were, it would only apply to mass marketing fraudulent activities with less than 50 victims. Such a situation defies logic, as by designation, "mass marketing" is done "for the masses." It instead appears that the "mass marketing" enhancement is appropriate when the Court is aware that individuals were harmed as a result of fraudulent activity, but it is impossible to discern individual victims with specific losses and/or individual victims are not named or known. These are the exact circumstances now before the Court. Accordingly, Mr. Lin argues that, at minimum, the Court should reduce the enhancement for number of victims from a +6 to a +2.

alleged in the indictment (2007-2010) as he was maintaining full time employment elsewhere.

Second, and more importantly, the relationship with the billing aggregators at issue in the

indictment was solely monitored and managed by Roy Lin.  In this vein, the evolving scheme

was between Roy Lin and Payment One – a relationship that John Lin had nothing to do with.

Although John Lin fully admits and accepts full responsibility for signing the forms that he

signed in the instant case containing the misrepresentations described in the PSR, and completely

admits  that it was wrong to sign a form containing false information for the purpose of gaining

access to LEC billing, he was simply not privy to the scope or extent of the scheme to defraud

and had no role in devising it.  A minor role adjustment of -2 is accordingly warranted.

### A. The Witnesses in this Case Would Have Attested At Trial that John Lin Had No Role in The Billing Aggregator Relationship and Did Not Do Much at INC 21 In the Time Period Charged in the Indictment

The witness interview reports provided by the government to the Probation Office do not

supports its conclusion of "equal" culpability – they instead support the conclusion that John

Lin's main role at the company was in information technology and product development - and

that he was not involved at all in the relationships with the billing aggregators or the nuts and

bolts of billings and receivables.  These employee interviews also make clear that Roy Lin was

the boss of INC 21 and that John Lin was not a co-owner of the company.  *See* Second

Declaration of Elizabeth Falk*,* Employee Interview Reports, Ex. B and C, filed herewith, at  INC

13177 (John Lin is "one step down" from Roy Lin); INC 131179 ("John manages the IT

Department and doesn't come in much"); INC 131184 ("John Lin . . played somewhat of an

executive role but was unsure of the details") INC 131161 ("Truit reported that she worked for

Roy Lin . . .Truit identified John Lin as the COO of the IT department."); INC 131197 ("John

Lin does not have an official title at INC 21.....John Lin is in and out of the office and helps with

information technology...John Lin does not have an office."); INC 131216 ("John Lin didn't

really do much of anything...it was hard to tell what he did, but he was the person to go to for

refund approvals, and he helped with the computers.  John wasn't there much of the time."); INC

131272 ("John Lin was more involved in the technical side of the business."); INC 131287 ("Roy Lin had more say in the company and took on more responsibility.").

The PSR's conclusion that John and Roy Lin shared equal responsibility, management responsibilities, and control over the dealings of INC 21 is accordingly not supported by the actual statements of the witnesses who were present at the company.

**B. Had the Case Gone to Trial, the Billing Aggregator Witnesses Would Have Testified that they Had Little to Do With John Lin**

Importantly, the billing aggregator witnesses themselves explain that John Lin was not nearly as involved as Roy Lin in their day-to-day or business dealings, thereby confirming that John Lin is much more divorced from this fraud than Roy Lin. *See, e.g.*, Falk Dec II, Exhibit C, Wilkens Interview, INC 131239 ("Roy Lin is the client of Payment One, and they rarely dealt with John Lin); Perez Interview, INC 131251 (John Lin was the "operations guy." John Lin was involved in the technical side of INC 21..."); see also Falk Dec II, Ex. B, PEREZ interview dated May 26, 2010 (stated that in his consulting work with INC21, he dealt with Roy Lin 90% of the time, and further stating that once in a while he would discuss things with John Lin, and sometimes John would be around when he met with Roy.)

Given the aforementioned, it is important for the Court to understand that INC21 was Roy Lin's business from top to bottom, and he alone managed and monitored the relationship between all the INC21 companies and Payment One, the billing aggregator. For example, when Payment One communicated with INC 21 about billing, those communications solely went to Roy Lin. John Lin was simply not a part of those communication. *See, e.g.*, Falk Dec II, filed herewith, at Exhibit A (sample emails showing that communications between Payment One and INC21 went to Roy Lin and Roy Lin alone - John Lin was neither copied nor the recipient of these emails.)

In a similar vein, PaymentOne only contacted Roy Lin when an executive decision needed to be made or crucial information needed to be delivered. *See* PAY1_GLOBALYP 35120); (PAY1_GLOBALYP 34584)(attached); (PAY1_GLOBALYP 26567). In an email dated

August 04, 2005 (PAY1_GLOBALYP 24293), PaymentOne Account Manager Evelyn Wengeler

asks Roy: "Please let me know how you prefer to move forward – a) get articles of incorporation

or b) get the fictitious name statements."  Similarly, on March 25, 2008 PaymentOne Client

Services Manager Jeff Wilkins emailed ROY LIN (PAY1_GLOBALYP 31889) with an offer: "I

can broker a deal....if you're interested in selling some of your customer base for $150.00 per

customer …......up to 10k or so.. $1.5 million dollar transaction.....if you're at all interested in this

potential win-win deal which will bring you significant short-term revenue."

It is not an accident that John Lin is not copied on these emails, as he did not play any

significant part in the INC 21 companies' relationship with Payment One and did not influence

the billing process in any significant way.  Additionally, the government's star witness in this

case, Ariel Adams, indicated that his conversations about the Sub-CIC forms at issue solely

occurred with Roy Lin, as opposed to John Lin, and that his "discomfort" with the forms

revolved around Roy Lin's answers to his questions.  *See* INC131316. Mr. Adams does not

describe having any such uncomfortable conversations with John Lin.  This is because Mr. Lin

played no role in masterminding or devising this fraud.   While Mr. Lin certainly concedes

culpability in the signing of the Jumpage forms containing false information and in his part of

causing the mailing of the application in connection with Count 7, he was neither the mastermind

of the misrepresentation scheme nor the person responsible for the Payment One or ILD

accounts.  This overall area of the business was not his area of responsibility, and the

government has no evidence that John Lin was aware of what Roy Lin was doing or saying to

Payment One other than supposition that because they are brothers, they must have

communicated.

The government responds to these arguments by arguing that because John Lin profited

from INC 21 in at least equal part as Roy Lin, he should not be entitled to a minor role

adjustment.  *See* Gov. Memo at p. 11.  But the fact that Mr. Lin knew the company was making

money - and that he transferred that money – does not establish that Mr. Lin had full knowledge

and understanding that the company was making the money he transferred through a scheme to defraud. While it is true that John Lin was responsible for investing company profits and managing INC 21's money, he did so because his brother was a terrible money manager and had absolutely no expertise in the area of investment.  The reason John Lin's name is seen on the money transfers set forth by the government is because he agreed to serve in this capacity at his brother's request – to purchase properties with INC 21's profits and manage those properties as his expertise in this area allowed.  The fact that John Lin managed INC21's money does not establish that he played an equal role in the scheme to defraud.

In sum, John Lin's role at INC21 from 2007 to 2009 was minimal and was limited to information technology support and customer service.  He had nothing to do with the billing aggregator relationship and served as an officer and/or director in name only. A  defendant is entitled to a two-level decrease in his offense level "if [he] was a minor participant in any criminal activity." U.S.S.G. § 3B1.2(b).  To successfully obtain the adjustment, "he must show that he was substantially less culpable than the average co-participant." *United States v. Ladum*, 141 F.3d 1328, 1348 (9th Cir. 1998).  As the PSR establishes, Mr. John Lin maintained full time employment at an entirely separate company for the duration of the charged conduct, and was not at all knowledgeable about the daily dealings of INC 21 during that time.  He played no role in the billing aggregator relationship and was not privy to the scope or extent of the scheme.  He is simply not as culpable as Roy Lin in the charged conduct.  A 2 level Guideline reduction should be applied.

**III.    Mr. Lin Objects to the Loss Amount Calculated in the PSR**

Mr. Lin fully accepts responsibility for his role in the instant offense and for signing forms containing fraudulent information.  He objects, however, to the government's assessment of the loss amount at issue in the instant case on a number of grounds and maintains that the loss amount attributable to him should be less than $10,000, in accordance with the count of conviction.

### A. The Evidentiary Standard the Court Should Use for A Loss Amount Exceeding $5,000,000 Should Be Clear and Convincing Evidence

Ordinarily, the burden of proof the government must meet to establish a sentencing enhancement factor is "preponderance of the evidence." However, "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction . . . a higher standard of proof may be required." *United States v. Mezas de Jesus*, 217 F.3d 638, 642 (9th Cir. 1996)(citing *United States v. Restrapo*, 946 F.2d 654, 661(9th Cir. 1991))(en banc). Here, the government seeks to enhance Mr. Lin's sentence on loss amount grounds, from Offense Level 7 to Offense Level 25; a loss amount enhancement of +18 which substantially increases Mr. Lin's sentencing exposure.

In *United States v. Johansson*, 249 F.3d 848, 853 (9th Cir. 2001) the Ninth Circuit identified several factors to determine whether a clear and convincing standard is necessary before a sentencing enhancement is applied:

1. Does the enhanced sentence fall within the maximum sentence for the crime alleged in the indictment?

2. Does the enhanced sentence negate the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment?

3. Do the facts offered in support of the enhancement create new offenses requiring separate punishment?

4. Is the increase in sentence based on the extent of a conspiracy?

5. Is the increase in the number of offense levels less than or equal to four?

6. Is the length of the enhanced sentence more than double the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence?

*Id*. at 854. Here, factors 5 and 6 clearly apply. Moreover, the increased sentence is not based upon the existence of a conspiracy, because no defendant in this case has pled guilty to a conspiracy. Accordingly, the Court should evaluate the government's proffered loss amount in

this case under a "clear and convincing" standard of proof.

### B. The Government's "Gain" Theory of Actual Loss is Flawed Because It Fails to Take into Account the Crediting Rule

According to the draft PSR, loss is properly calculated as the entirety of gross revenue generated by INC 21 and its affiliates between April 2007 and June 2009.  The PSR's reported loss theory is apparently one of "gains" of the INC 21 companies and/or affiliates at issue.  *See* PSR ¶ 27.  To the extent that this loss figure is proffered as "ill gotten gain" as an alternative measure of actual loss, the government's figure does not address the crediting rule.  Under the "crediting rule" of the Guidelines, the fair market value of the services rendered by the defendants to the victims must be credited against any findings of actual loss.  *See* U.S.S.G. §2B1.1, Commentary, Application Note E(I).  While revenues were certainly generated in the instant case, goods and services were fairly provided.  Because "value may be rendered even amid fraudulent conduct," Mr. Lin must be credited for the value of the services that INC 21 fairly provided to consumers.  *See United States v. Barnes*, 125 F.3d 1287, 1290 (9th Cir. 1997); *United States v. Rutgard*, 116 F.3d 1270, 1292-1293 (9th Cir. 1997).  There has been no evidence proffered to the Probation Department that the loss figure asserted in this case represents revenue obtained for no consideration or absent the provision of the services promised.  Accordingly, Mr. Lin objects to the failure of the government to accurately reduce the loss figure by goods and services actually provided.

### C. Mr. Lin Objects to the Loss Amount Because it Employs a "Gross Gain" Theory as Opposed to a "Net Gain" Theory

Mr. Lin also objects to the loss figure in that the number provided of over $5,000,000 is gross receipts, rather than net gain; this figure does not take into account the costs associated with running the company, such as salaries of legitimate employees, overhead and sales costs (such as the Google Adwords account that ate up nearly all of Jumpage's net gain but was necessary for the implementation of Jumpage's services).  *See* Falk Dec., Exhibit D, Accounting Spreadsheet of Jumpage Revenues and Costs (indicating that actual gains from Jumpage billing

was only $56,172.11.)  To the extent the government seeks to employ a "gain" theory of loss, these costs must be factored in because neither Roy nor John Lin could reasonably be held accountable for expecting company gain as pure profit without simultaneously expecting to pay company expenditures.  This objection accordingly holds true for both a loss theory of actual loss, intended loss, or "gain" as an alternative to loss.  *See United States v. Hepburn*, 1996 U.S. App. LEXIS 15866, at *6 (9th Cir. 1996)("As a general matter, we agree with Hepburn that 'actual loss' under the Guidelines probably should be defined as 'net loss.'") In this vein, the government's loss (gain) calculation is fatally flawed because it utterly fails to take into account these legitimate expenditures, such as the salaries and benefits paid to legitimate employees, server hosting costs, and other legitimate company expenses.  Because the government bears the burden of presenting an accurate loss figure, the Court should reject the government's loss calculation in the instant case.

> **C.     The Loss Amount Attributed to Roy Lin Cannot Be Simply Transferred to John Lin Because the Entirety of the Stipulated Loss Was Not Reasonably Foreseeable to John Lin.**

The PSR in the instant case simply transfers the applicable loss amount from the PSR of Roy Lin to the PSR of John Lin.  But the fact that Roy Lin, as the founder, owner, operator, and CEO of INC 21, stipulated to a certain loss amount does not mean that the government can automatically use that loss amount against John Lin.  Although the instant case was charged as a conspiracy, neither defendant pled guilty to a conspiracy.

To meet its burden in this regard, the government must point to some facts establishing John Lin's knowledge of the scope and extent of the scheme to defraud above and beyond the count of conviction.  In doing so, the government points to three facts: 1) the listing of John Lin as a corporate officer and director; 2) John Lin's receipt of several hundred thousand dollars, and 3) John Lin's plea agreement statement in which he states "during the period April 2007-April 2009, I ran INC 21.)  Gov. Memo at 7.  These facts do not meet the government's burden, either under a preponderance of the evidence or a clear and convincing standard of proof.  As the

government's own allegations go, the fact that an individual is listed as a corporate officer or director of any of these companies is essentially meaningless in terms of discerning the level of involvement or knowledge about the company.  For example, Mr. Lin's father and mother were also listed as corporate officers and directors, but the government does not contend that these titles meant anything.  In the case of John Lin, being named as an officer or director similarly does not mean he had any ongoing knowledge of the scope and extent of the scheme to defraud devised and implemented by Roy Lin and Payment One.

The same is true with the profits reaped with INC 21.  This is not a case where the government is contending that INC 21's entire business was permeated with fraud and/or that the company never provided any legitimate products to consumers.  The government has not pointed to any evidence that John Lin was aware that the entirety of the $5,000,000 in gross gains enjoyed by INC 21 through the Payment One relationship were obtained as a result of misrepresentations made on forms by Roy Lin or of his knowledge as to the extent of Roy Lin's activities.  In essence, the government is arguing that because John Lin is the brother of Roy Lin, he must have known what was going on.  But this contention is belied by the actual witnesses in the case who worked at INC 21 and the billing aggregator witnesses themselves, who explain in copious interviews that the company was run, managed, and operated by Roy Lin and that John Lin was not a significant presence at the company between 2007 and 2009 and did not take much part in the billing aggregator relationship.

In sum, the government must do more at sentencing than attach a spreadsheet to its sentencing memorandum and argue that because Roy Lin stipulated to a certain loss amount in this case, this loss must have been reasonably foreseeable to John Lin.  The government has not met its burden to tie the loss amount stated in the PSR to John Lin specifically.  Accordingly, the Court should revert to the loss amount in the count of conviction and find that the loss in this case as attributed to John Lin is between $5,000 and $10,000 in loss.

**IV.      Requested Revision to the Applicable Guideline Range.**

Were the Court to accept all of Mr. Lin's requested revisions to the Guideline range, the resulting Adjusted Offense Level would be as follows:

Base Offense Level:   7

Loss Amount:         +2 (Loss of less than $10,000, as charged in the Indictment

Victim Adjustment:   +0 (or +2, for a mass marketing adjustment)
Minor Role:          -2

Acceptance
of Responsibility:    -2

ADJUSTED
OFFENSE
LEVEL:               5

Resulting Guideline Range:    0-6 Months at CHC I.

Accordingly, Mr. Lin requests that the Applicable Guideline Range be revised in the PSR to reflect a sentencing range of 0-6 months.

**REQUEST FOR VARIANCE: THE COURT SHOULD FURTHER VARY OR DEPART DOWN TO A SENTENCE OF THREE YEARS OF PROBATION AFTER BALANCING ALL OF THE § 3553(a) FACTORS**

Even if this Court were to reject all of Mr. Lin's requested revisions to the Applicable Guideline range, the Probation Officer has indicated his view that a significant variance in sentence (well below the Guideline range is warranted.)  In this vein, the Probation Officer has recommended a sentence of 24 months of imprisonment.   Under the factors enunciated in 18 U.S.C. § 3553(a), Mr. Lin shares in the Probation Officer's view – but for the reasons stated, requests a sentence of 3 years of probation.

**I.      A Sentence of 3 Years of Probation is Warranted Given Mr. Lin's Overriding Law Abiding Background, Solid Family History, and Potential for Rehabilitation**

Mr. Lin has zero criminal history points, and has never spent even one day in custody.  In *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005), the court noted:

\\

\\

> It is appropriate for a court, when considering the type of sentence necessary to protect the public and deter future misconduct, to note the length of any previous sentences imposed. Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.

*Id.* (distinguishing career offender from first-time offender); *see also United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) ("a prison term would mean more to Mr. Baker than to a defendant who had previously been imprisoned").

Although Mr. Lin's lack of a criminal record is reflected in his Criminal History of I, the Ninth Circuit has found that a downward variance is not unreasonable for a defendant facing his first conviction because the Criminal History Category of I "did not fully account for his complete lack of criminal history" since a defendant with a minor criminal history may still fall within Category I. *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009). In *Autery*, the Ninth Circuit found consideration of the defendant's lack of criminal history "was not redundant or improper" even though his lack of a prior record was taken into account in determining his Criminal History Category. *Id.*.

Moreover, the Court should further take into account the aberrant nature of this behavior. Mr. Lin has lived an otherwise law-abiding life. His behavior in this case was completely out of the norm for him. Even prior to *Booker*, the Court could depart downward for aberrant behavior. *See United States v. Morales*, 972 F.2d 1007, 1011(9th Cir. 1993) (holding that a downward departure for "aberrant conduct" may also be granted even where the defendant has no criminal history). Given Mr. Lin's longstanding dedication to legitimate work and educational activities, community service and family, the actions charged in the instant case were isolated. In the context of this otherwise outstanding personal history, the misrepresentations made on the form in the instant case should be viewed as a one-time lapse in judgment. Whether the Court departs downward or grants a variance, the aberrant nature of this conduct should be taken into consideration in fashioning a reasonable sentence.

**II.     A Sentence of 3 Years of Probation Will Afford Adequate Deterrence, Protect the Public, Promote Rehabilitation and Promote Respect for the Law**

There is no doubt that Mr. Lin has learned his lesson; he understands the severity of what he has done and has expressed genuine remorse for his actions.  No one contends that he is a public safety risk or that the public needs to be protected from Mr. Lin.  He presents a minimal, if any, risk of re-offending and a sentence of three years of probation is a significant sanction to adequately promote respect for the law and general deterrent.  Anything longer would be purely for the sake of punishment and add nothing to the remaining goals of sentencing. Mr. Lin is unique in that he has never been in custody and has no violent habits or history.  It would be tragic if he were sentenced to such a lengthy term in custody under the circumstances.

Moreover, as noted in the Sentencing Memorandum of Roy Lin, this case is unique in that the loss amount alleged by the government in this case has already been collected and dedicated to a victim reimbursement fund.  See Roy Lin Sentencing Memorandum at 22.  The fact that the loss alleged has already been repaid and/or is available for repayment to victims is an additional reason meriting a mitigated sentence here.

An additional reality of this case for Mr. Lin  is the risk that he will face deportation at the conclusion of this case.  Upon completion of any custodial sentence, Mr. Lin will likely be transferred to immigration custody and will need to fight to keep his green card by arguing he has never been convicted of an aggravated felony.  A non-custodial or short prison sentence in the instant case will go a long way toward convincing an immigration judge that Mr. Lin's petition to remain in the United States is worthy of consideration.  Because the IJ will have discretion in Mr. Lin's case (and deportation will not be mandatory given the Plea Agreement and the count of conviction), this Court should consider the fact that a longer term of imprisonment could have the additionally tragic effect of guaranteeing Mr. Lin's removal from this country and return to a country that he hasn't lived in since he was in the fourth grade.  Such a significant sanction is not warranted for Mr. Lin's conduct in this case.  The Court should

instead sentence Mr. Lin to three years of probation for the instant offenses.

## CONCLUSION

Mr. Lin's lack of criminal history, steady and long-term employment, community service history, and commitment to family warrant leniency from this Court and a sentence of three years of probation. As stated best by close friend and confidant Kevin Nowack:

**I firmly believe that John's conduct was the result of bad judgment and not a true reflection on his character or attitude. . . I know John would give anything to go back and change his conduct. He has stated that to me on numerous occasions. I, as his friend, also wish he had that ability because that conduct represents a singular error by what I know to be an otherwise good, law-abiding, and humble man that will never be repeated.**

Falk Dec. I, Exhibit A, Letter of Kevin Nowack (friend)

Accordingly, in consideration of all of the factors of 18 U.S.C. § 3553(a), Mr. Lin submits that a sentence of three years of probation is sufficient but not greater than necessary to serve the goals of the sentencing statute.

Dated: April 25, 2013                     Respectfully submitted,

                                          STEVEN G. KALAR
                                          Federal Public Defender

                                          ___/s/_____
                                          ELIZABETH FALK
                                          Assistant Federal Public Defender